UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:

                                      Chapter 11

FPSDA I, LLC, *et. al.,*

                                        Case No. 10-75439
                                        (Jointly administered)

       Debtors.
-------------------------------------------------------X
FPSDA II, LLC, *et. al.,*

                                        Adv. Pro. No. 12-08032

       *Plaintiffs*,

       -against-

Lisseth Larin,

       *Defendant.*
-------------------------------------------------------X

## MEMORANDUM DECISION AND ORDER

*Appearances:*

                         Ruskin Moscou Faltischek
                         *Attorneys for Plaintiffs*
                         1425 RXR Plaza
                         Uniondale, NY 11556
                         By: Michael Amato, Esq.

                         Frank & Associates P.C.
                         *Attorneys for Defendant*
                         500 Bi-County Boulevard
                         Suite 112N
                         Farmingdale, NY 11735
                         By: Scott Laird, Esq.,
                         Peter Romero, Esq.

          Honorable Dorothy T. Eisenberg, United States Bankruptcy Judge

## **Introduction**

As set forth more fully below, Debtors and plaintiffs in this case have filed an adversary proceeding seeking the extension of the automatic stay to protect certain non-debtor parties from pending litigation before the United States District Court for the Eastern District of New York. Debtors have also filed a motion for a preliminary injunction, seeking essentially the same relief pending the ultimate resolution of this adversary proceeding.

This Memorandum addresses only the motion for a preliminary injunction. For the reasons set forth below, the motion for a preliminary injunction is DENIED.

## **Factual and Procedural Background**

The following facts are taken from: (1) The materials which have been filed and docketed in connection with the above-captioned case and adversary proceeding; (2) the papers submitted by the parties; and (3) the representations of counsel for the parties at the various hearings held in this matter. The facts are undisputed, except where otherwise indicated.

I. The bankruptcy filing.

On or about July 13-14, 2010, sixteen (16) related corporate entities[1] (the "Debtors") filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). On July 21, 2010, this Court issued an order consolidating the Debtors' bankruptcy cases for administrative purposes only. The Debtors' procedurally-consolidated bankruptcy cases are still pending before this Court as of the date of this Memorandum.

---

[1] The Debtors are: Commack Road Donuts, LLC; FPSDA I, LLC; FPSDA II, LLC; Highbridge Donuts, LLC Metro Shops, LLC; Middle Country Road Donuts, LLC; Five Points Development Partners, LLC; Mountain Road Donuts, LLC; Benfield Donuts, LLC; Upper Marlboro, LLC; CDDC Holding Company, LLC; Miller Place Donuts, LLC; CDDC Acquisition Company, LLC; D3C, LLC; Kingdom Donuts, LLC; and Blue Point Ventures, LLC. 2 entities, 1333 Donuts, LLC and Coram Kitchen, LLC, are not Debtors, but remain part of the Debtors' larger corporate network.

Debtors and their counsel have worked robustly with the various parties in interest to this case since the date of filing, and substantial progress has been made on numerous issues affecting the ultimate confirmability of a plan of reorganization. Debtors submitted their first amended disclosure statement, together with the corresponding plan of reorganization, for the approval of this Court on July 25, 2012. Approval is still pending.

II. The Debtors.

The primary business of the Debtors has been to own and operate Dunkin' Donuts and/or Baskin Robins franchises both in Maryland and in Suffolk County, New York on Long Island. Poor store-level operations, in conjunction with the severe economic downturn, initially prompted the bankruptcy filings.

On June 9, 2011, this Court approved the sale of six (6) Maryland locations under 11 U.S.C. § 363. Upon the sale, the seven (7) Debtors primarily responsible for the Maryland locations effectively ceased most business operations.[2] The remaining nine (9) Debtors still own and operate the seven (7) remaining New York locations as part of the ongoing reorganization efforts, and these Debtors are still actively conducting business (the "Operating Debtors").[3]

**A. Blue Point**

Though the Debtors are technically sixteen (16) separate entities, the Operating Debtors' activities have, of late, been largely centralized under the aegis of Operating Debtor Blue Point Ventures, LLC ("Blue Point"). Blue Point is a limited liability company ("LLC") organized

---

[2] These Debtors are: (1) D3C, LLC; (2) Mountain Road Donuts, LLC; (3) Benfield Donuts, LLC; (4) Highbridge Donuts, LLC; (5) Kingdom Donuts, LLC; (6) Upper Marlboro, LLC; (7) Metro Shops, LLC.

[3] The Operating Debtors include: (1) Blue Point; (2) CDDC Holding Company, LLC; (3) CDDC Acquisition Company, LLC; (4) Commack Road Donuts, LLC; (5) FPSDA I, LLC; (6) FPSDA II, LLC; (7) Five Points Development Partners, LLC; (8) Miller Place Donuts, LLC; and (9) Middle Country Road Donuts, LLC. These Debtors operate seven (7) New York locations.

under the laws of the state of Delaware.[4] Blue Point is also a direct or indirect equity stakeholder, in varying percentages, in virtually all of the other Operating Debtors.[5] Additionally, Blue Point's president exercises general working control over the Operating Debtors, running them in many ways as one integrated enterprise. Moreover, even though the Debtors are not substantively consolidated, the Operating Debtors' receipts and disbursements are handled largely through Blue Point; Blue Point receives the Operating Debtors' cash proceeds, and then makes disbursements on their behalf as required to meet their expenses. Indeed, it is fair to characterize Blue Point as the "hub" for the Operating Debtors' business activities.

### B. Curd and Smith

Howard F. Curd ("Curd") served as Blue Point's CEO from around December of 2007 to sometime in the fall of 2008, at which time his employment was terminated. Since then, Curd has had relatively little significant involvement with the Debtors' operations. Nevertheless, Curd is a member of Five Point Partners, LLC, which is in turn a member of Blue Point.

In May of 2009, Blue Point hired Thadd Smith ("Smith") as its president. Smith is the individual primarily responsible for running the Operating Debtors; the Debtors thus assert that Smith is crucial to their reorganization. Neither Curd nor Smith is a debtor in any pending bankruptcy.

---

[4] Blue Point was founded in late 2007 by partnership between non-Debtor Blue 9 Capital, LLC (a private equity firm) and non-Debtor Five Points Partners, LLC (not to be confused with Debtor Five Points Development Partners, LLC). Blue 9 Capital is a general partner in non-Debtor Blue 9 Fund I, LP, which in turn owns 100% of the equity in Debtor Blue Point. Blue 9 Capital provides more general oversight for all of the Debtors, in a role analogous to a corporate board of directors, while, as discussed *infra,* Blue Point, through its president, oversees the ongoing business activities of the Operating Debtors.

[5] The Operating Debtors' hierarchy of equity ownership is as follows: Blue Point is an equity stakeholder in the following entities, in the following percentages:
(1) 66.7% in Debtor CDDC Holding Company, LLC, which, in turn, owns Debtors CDDC Acquisition Co., LLC and Commack Road Donuts, LLC;
(2) 100% in Debtor Five Points Development Partners, LLC, which, in turn, owns 100% of the following Debtors: (A) FPSDA I, LLC; (B) FPSDA II, LLC; (C) Miller Place Donuts, LLC; (D) Middle Country Road Donuts, LLC;
(3) 50% in non-Debtor 1333 Donuts, LLC, which, in turn, owns non-Debtor Coram Kitchen, LLC, which is a bakery supplying baked goods for sale by the Operating Debtors' stores.

Finally, it is worth noting that, throughout the pendency of the Debtors' bankruptcy cases, Allen Paik has been the party acting on behalf of the Debtors, and he is the party who signed their chapter 11 petition. Prior to the Motion, the Court has not heard from Messrs. Curd and Smith, nor been alerted previously that either individual was actively engaged as a representative of these chapter 11 Debtors, but Smith was indicated to be President and CEO of Blue Point in Exhibit H to Mr. Paik's sworn declaration pursuant to Local Rule 1007-4 of this Court.

C. Blue Point's Operating Agreement

Blue Point's operating agreement with the bankrupt Debtors (the "Operating Agreement") provides, *inter alia,* as follows, with the most pertinent language emphasized:

8.2 Right to Indemnification. Subject to the limitations and conditions as provided in this Article VIII, each Person [as defined in the Operating Agreement] who was or is made a party . . . to ... any threatened, pending or completed action, suit or proceeding ... (hereinafter a "Proceeding") ... , by reason of the fact that he or she ... is or was a Manager or Officer of the Company or is or was serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise. . . **shall be indemnified by the Company [i.e. Blue Point] to the fullest extent permitted by the [Delaware Limited Liability Company] Act and the [Delaware] Corporation Act… against judgments, penalties ... , fines, settlements and reasonable expenses (including, without limitation, attorneys' fees) actually incurred by such Person in connection with such Proceeding, and indemnification under this Article VIII shall continue as to a Person who has ceased to serve in the capacity which initially entitled such Person to indemnity hereunder ....**

8.3 Advance Payment.    The right to indemnification conferred in this Article VIII shall  include  the right to be paid or reimbursed by the Company the  reasonable expenses incurred by a Person of the type entitled to be indemnified under Section 8.2 who was, is or is threatened to be made a named defendant or respondent in a Proceeding **in advance of the final disposition of the Proceeding and without any determination as to the Person's ultimate entitlement to**

4

**indemnification**; provided, however, that the payment of such expenses incurred by any such Person in advance of the final disposition of a Proceeding, **shall be made only upon delivery to the Company of a written affirmation by such Person of such Person's good faith belief that such Person has met the standard of conduct necessary for indemnification under this Article VIII and <u>a written undertaking,</u> by or on behalf of such Person, to repay all amounts so advanced if it shall ultimately be determined that such Person is not entitled to be indemnified under this Article VIII or otherwise**….

8.4 <u>Indemnification of Officers, Employees and Agents.</u> The Company . . . **may** indemnify and advance expenses to any employee or agent of the Company to the same extent and subject to the same extent and subject to the same conditions under which it may indemnify and advance expenses to Persons who are not or were not Mangers or Officers but who are or were serving at the request of the Company as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another foreign or domestic limited liability company, corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan or other enterprise against any liability asserted against him or her and incurred by him or her in such a capacity or arising out of his or her status as such a Person to the same extent that it may indemnify and advance expenses to Managers and Officers under this Article VIII.

The provisions of the Operating Agreement relating to indemnification for, and advancement of, legal expenses will be referred to as the "Indemnification Agreement." Only Debtor Blue Point has, in its Operating Agreement, anything like this Indemnification Agreement.[6]

III. The Larin Case

On December 5, 2011, Lisseth Larin ("Larin" or "Defendant") filed a complaint (the "Larin Complaint") in the United States District Court for the Eastern District of New York (the "District Court") against certain of the Debtors, and against Curd and Smith in their individual

---

[6] Even so, the Debtors contend that the Operating Agreement is structured so that each separate Debtor, or at least each Operating Debtor, is bound to comply with the Indemnification Agreement. This Memorandum proceeds as if all of the Debtors are obliged under the Indemnification Agreement.

capacities. The case commenced by the Larin Complaint is captioned *Larin v. CDDC Acquisition Company, LLC et al.,* (EDNY Docket No. 11-05921 (ADS)) (the "Larin Case").

According to the Larin Complaint, Larin was first hired by Debtors at their Commack, NY location as a clerk. In July 2010, she was promoted to "shift leader." In the Larin Case, Larin brings suit not only on behalf of herself, but also on behalf of similarly-situated "shift lead workers."[7]

The Larin Complaint alleges, in sum, that some of the Debtors, as well as Curd and Smith while serving as officers of the Debtors, violated provisions of the federal Fair Labor Standards Act (29 U.S.C. §§ 206-207) ("FLSA"), as well as New York's Minimum Wage Act (N.Y. Lab. Law ("NYLL") § 650 *et. seq.* and N.Y. Comp. Code. R. & Regs. Tit. 12 § 142),  with respect to Larin and other, similarly-situated "shift lead workers" by, for example, failing to meet certain payroll obligations, failing to pay required minimum wage and overtime, and failing to preserve accurate wage records for a 6-year period running from December 5, 2005 to December 5, 2011.

Since Larin filed the Larin Complaint against the Debtors after the time of their bankruptcy filing, the Larin Case was stayed, as to the Debtors, under 11 U.S.C. § 362(a). Debtors' counsel so notified counsel for Defendant, who voluntarily dismissed her claims against the Debtors on January 11, 2012. Defendant has continued to pursue the Larin Case against Curd and Smith in their individual capacities, but has not manifested the slightest inclination to resume prosecuting the Larin Case against any of the Debtors.

---

[7] For purposes of the Larin Complaint allegations under the FLSA, Larin brings the suit on behalf of herself and similarly-situated "shift lead workers" as an "opt-in collective action" under 29 U.S.C. § 216(b). For purposes of the Larin Complaint allegations under the NYLL, Larin brings the suit on behalf of herself and similarly-situated "shift lead workers" as a class action under Federal Rule of Civil Procedure 23. Thus, Larin is suing both in a personal and a representative capacity under both the FLSA and NYLL. Larin's counsel represented before this Court at a hearing that the Larin Case has not yet received class-action certification from the District Court.

IV. The adversary complaint and motion for a preliminary injunction:

On January 26, 2012, Debtors filed in this Court an adversary complaint (the "Adversary Complaint"), seeking: (1) A declaratory judgment that the automatic stay of 11 U.S.C. § 362(a) extends to protect not only the Debtors, but also Curd and Smith; and (2) an Order enjoining Larin from pursuing the Larin Case in the District Court against Curd and Smith.

On January 27, 2012, Debtors filed this motion for a preliminary injunction (the "Motion"),[8] asking that prosecution of the Larin Case be stayed, as to Curd and Smith, pending a final resolution by this Court of the Adversary Complaint. Debtors and Larin have submitted ample papers in support of, and in opposition to, the relief requested in the Motion.

On November 6, 2012, this Court held a hearing, where counsel for both Debtors and Larin appeared and were heard, and where this Court indicated that the Motion would be taken under advisement. For the reasons discussed below, the Motion, seeking preliminary injunctive relief for Curd and Smith, is DENIED.

## Jurisdiction

Larin asserts in her papers that this Court lacks jurisdiction to enter the relief sought in the Motion.[9]

I. The nature and scope of the jurisdiction and power of the bankruptcy courts.

Controversies over the jurisdiction and power of the bankruptcy courts fall under two basic categories: (I) Whether the court has subject matter jurisdiction even to hear the dispute;

---

[8] Plaintiffs have also moved for a temporary restraining order, which will be disposed of in a separate Order. The Larin Case has been stayed, by stipulation between the parties, to November 4, 2012.

[9] The portions of the parties' papers dealing with this Court's subject matter jurisdiction seems largely to conflate the question of jurisdiction with the underlying merits of the Motion. Larin says in essence that "the automatic stay should not be extended to Curd and Smith under applicable case law; therefore, this Court lacks jurisdiction to extend the stay to Curd and Smith." Debtors say, in essence, "Debtors are liable under the Indemnification Agreement; therefore, the estate is affected, the Court has jurisdiction, and the stay should be extended." However, jurisdiction over a matter, and the substantive legal merits of a matter, are two distinct things. *See Robert Plan Corp. v. Liberty Mut. Ins. Co.*, 2010 WL 1193151 at *2 (E.D.N.Y. March 23, 2010).

and (II) assuming that the court has subject matter jurisdiction, whether the bankruptcy court has power to enter a final order disposing of the dispute, or whether it must submit a report and recommendation to the relevant United States District Court.

## II. Subject matter jurisdiction.

The subject matter jurisdiction of the bankruptcy courts is governed by 28 U.S.C. §§ 1334 and 157(a). The federal district courts have exclusive jurisdiction over every "case under" the Bankruptcy Code, which is simply the overall bankruptcy case "at large," which is instituted upon the filing of any bankruptcy petition.[10] Moreover, they have original, but not exclusive, jurisdiction over every civil proceeding "arising under" the Bankruptcy Code, "arising in" a bankruptcy case, or "related to" a bankruptcy case. *See* 28 U.S.C. §§ 1334(a), (b); *accord Atamian v. U.S. Dep't. of Ed., et. al. (In re Atamian)*, 368 B.R. 375, 379 (Bankr. D. Del. 2007).[11] Further, every federal district court has power to "refer" all bankruptcy cases and related civil proceedings to the bankruptcy courts of that district. Once this is done, the bankruptcy courts enjoy the same statutory subject matter jurisdiction as the district courts over the matter. 28 U.S.C. § 157(a); *see also In re RNI Wind Down Corp.*, 348 B.R. 286, 292 (Bankr. D. Del. 2006).

Further, a civil proceeding is one "arising under" the Bankruptcy Code if it "invokes a substantive right created by the Bankruptcy Code," such as a preference/turnover action under 11 U.S.C. §§ 547 and 542. *In re Atamian*, 368 B.R. at 379. A civil proceeding "arises in" a bankruptcy case if it is not provided for in the Bankruptcy Code, but would have no existence apart from a bankruptcy case. *Id.* at 379. A civil proceeding is "related to" a bankruptcy case

---

[10] *See* 11 U.S.C. § 301(a).
[11] To use this case as an example, the Debtors each instituted a "case under" the Bankruptcy Code when they filed their respective petitions. Both the Motion and the adversary proceeding are "civil proceedings arising under, arising in, or related to" the Debtors' "cases under" the Bankruptcy Code.

where its outcome "might have any conceivable effect" on the bankruptcy estate. *In re Quigley Co., Inc.*, 676 F.3d 45 (2d. Cir. 2012).

This Court finds that it has "related to" and "arising under" subject matter jurisdiction over the Motion. The automatic stay of 11 U.S.C. § 362(a) is found nowhere but in bankruptcy. It is imposed directly by the Bankruptcy Code, which in turn provides the Debtor with the "substantive right" to invoke its protections. *See* 11 U.S.C. § 105(a)(empowering bankruptcy courts to issue any order, process, or judgment necessary or appropriate to carry out the provisions of the Bankruptcy Code); *cf.* 11 U.S.C. § 362(j)(empowering any party in interest to request the court to confirm that the automatic stay has terminated under 11 U.S.C. § 362(c); *cf. also* 11 U.S.C. § 362(k) (providing an individual, injured by a violation of the automatic stay, with the right to recover damages).

Therefore, since the Bankruptcy Code both imposes the automatic stay and provides the Debtors and the Court with the means to invoke it and to implement its protections, it is manifest that any proceeding to determine the scope and applicability of the automatic stay "arises under" the Bankruptcy Code.[12] Moreover, common sense indicates that, if the Court has subject matter jurisdiction over a proceeding to determine the applicability of the automatic stay, then it has jurisdiction over a related motion for preliminary injunctive relief.

For these reasons, this Court finds that it has subject matter jurisdiction to decide the Motion. *Cf. In re Baldwin-United Corp. Litigation*, 765 F.2d 343 (2d. Cir. 1985)(recognizing the jurisdiction of bankruptcy courts to determine the applicability of the automatic stay); *accord Robert Plan Corp. v. Liberty Mut. Ins. Co.*, 2010 WL 1193151 at *2 (E.D.N.Y. March 23, 2010).

<u>III. Whether the Motion is a "core" or "non-core" proceeding.</u>

---

[12] Technically, § 362 cannot, by itself, provide the means to extend the protection of the automatic stay to non-debtors. Rather, that must be done under this Court's powers under 11 U.S.C. § 105(a). *See In re Pitts*, 2009 WL 4807615, at *8 (Bankr. E.D.N.Y. Dec. 8, 2009).

This Court has found that it has subject matter jurisdiction over the Motion. If a proceeding is a "core" proceeding, then this Court may enter a final order disposing of it. If the proceeding is "non-core," then this Court may hear it, but then must submit proposed findings of fact and conclusions of law to the District Court, which will then make the final determination on the matter. 28 U.S.C. § 157(b)(1), (c)(1).

28 U.S.C. § 157(b)(2) provides 16 non-exclusive examples of "core" proceedings. If a matter is not specifically listed in 28 U.S.C. § 157(b)(2), then it is still "core" if the Court has "arising under" or "arising in" jurisdiction over it. However, if a proceeding is merely "related to" a bankruptcy case, then it is "non-core." *Stoe v. Flaherty*, 436 F.3d 209, 217 (3d. Cir. 2006).

This Court has already determined that it has "arising under" jurisdiction over the Motion. Therefore, for the same reasons, this Court finds that the Motion is a "core" proceeding, and thus that this Court has power to enter a final order disposing of this Motion for a preliminary injunction.

Furthermore, in any event, the U.S. District Court for the Eastern District of New York, on August 28, 1986, entered a standing order of reference, referring all cases under the Bankruptcy Code, in addition to any civil proceedings arising under, arising in, or related to such cases, to the bankruptcy courts of this District, in accordance with 28 U.S.C. § 157(a).

Additionally, on December 5, 2012, effective *nunc pro tunc* to June 23, 2011, the District Court entered an order providing that, if a bankruptcy judge or a district judge of this District finds that a bankruptcy judge is unable to enter a final order or judgment in a civil proceeding, consistently with Article III of the U.S. Constitution, even though the proceeding is designated as "core" under 11 U.S.C. § 157(b), then the bankruptcy judge shall hear the matter and submit proposed findings of fact and conclusions of law to the District Court. The same order provides

that, if the District Court makes such a determination once a bankruptcy judge has entered an order or judgment in a civil proceeding, then the District Court may simply treat the order and judgment as proposed findings of fact and conclusions of law. Therefore, this Court's exercise of jurisdiction over the Motion is proper.

**Discussion**

I. The standard for granting a preliminary injunction:

The particular relief sought in the Motion is a preliminary injunction staying the prosecution of the Larin Case against Curd and Smith pending the resolution of the Adversary Complaint. This is proper, since the "function of a preliminary injunction [is] to preserve the status quo pending a determination of the action on the merits," and not to decide the ultimate merits of the case. *In re Casner*, 302 B.R. 695 (Bankr. E.D.Ca. 2003).

Federal Rule of Civil Procedure 65(a)(1), incorporated by Federal Rule of Bankruptcy Procedure 7065, provides for the issuance of a preliminary injunction, on notice to the adverse party. In the Second Circuit, the party seeking a preliminary injunction must show:

(1) That there is a sufficient probability that it will succeed in the underlying litigation (the "Probability Test"). In the Second Circuit, the "Probability Test" can be met by showing either:

(A) That the movant has a likelihood of success on the merits of the pending adversary proceeding, or

(B) Both

(i) That there is a "sufficiently serious question" going to the merits of the pending adversary proceeding to make them a fair ground for litigation, and

(ii) That the balance of hardships tips "decidedly in the [movant's] favor."

(2) In addition to satisfying the "probability of success" test, the movant must also show that it will suffer "irreparable injury" if a preliminary injunction is not granted.[13] *Lamonica v. North of England Protecting and Indemnity Ass'n, Ltd., et. al. (In re Probulk, Inc.)*, 407 B.R. 56, 60 (Bankr. S.D.N.Y. 2009); *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 152-153 (2d. Cir. 2007).

(3) The question of whether to grant a preliminary injunction also requires that the Court ensure that the "public interest would not be disserved" by the issuance of the preliminary injunction. *Salinger v. Colting*, 607 F.3d 68, 79 (2d. Cir. 2010).

II. The legal standard for the Probability Test.

**A. Likelihood of success on the merits.**

The question of whether the party seeking a preliminary injunction has shown a likelihood of success on the merits "necessarily focuses on the outcome of a later proceeding, at which time the merits of the questions giving rise to the litigation will be decided." *Matter of Commonwealth Oil Refining Co.*, 805 F.2d 1175 (5th Cir. 1986).

A showing of "likelihood of success" does not require the movant to prove its ultimate case. However, such a showing does require the movant to prove that, more likely than not, it will ultimately be able to prove its case, based on the record available to the Court at the time the motion for a preliminary injunction is decided. *See Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund, Ltd.*, 598 F.3d 30 (2d. Cir. 2010).

**B. "Serious question" as to the outcome/balance of harms and equities.**

---

[13] Alternatively, some courts have held that irreparable harm need not be shown if the bankruptcy court finds that the proceeding sought to be enjoined would "defeat or impair its jurisdiction with respect to a case before it." *See, e.g., Securities Investor Protection Corp. v. Bernard L. Madoff Inv. Securities, LLC*, 429 B.R. 423 (Bankr. S.D.N.Y. 2010). Given this Court's present decision in resolution of the Motion, the Court cannot find that continued prosecution of the Larin Case would defeat or impair its jurisdiction with respect to the Debtors' cases.

The "likelihood of success" and "sufficiently serious question" standards are not qualitatively different from one another; rather, they are two different points along a continuum of probability. *See Citigroup Global Markets, Inc.*, 598 F.3d at 36.

If there is no "likelihood of success," but there is a "sufficiently serious question" as to the outcome, then the "balance of hardships [must tip] *decidedly*" in favor of the movant. *Id.* This will be the case where the overall costs of denying the preliminary injunction outweigh the benefits of granting it. *Id.*

III. Application of the Probability Test to this Motion.

In the present matter, Debtors have failed to show a "likelihood of success" in prevailing on the Adversary Complaint. Moreover, even assuming that there is a "sufficiently serious question" as to the merits of the Adversary Complaint to justify continued litigation, the Debtors have not shown that the "balance of harms tips decidedly in their favor," so as to warrant this Court's issuance of a preliminary injunction halting the Larin Case.

**A. Extension of the automatic stay to protect non-debtors—legal principles**.

The filing of a bankruptcy petition operates as an "automatic stay" of any collection activity, arising from pre-petition claims, against: the debtor; the debtor's property; and the property of the debtor's newly-formed bankruptcy estate. There are exceptions to the automatic stay, which are not pertinent here. *See* 11 U.S.C. § 362(a), (b).

The general rule is that the automatic stay "only protects the debtor and does not extend injunctive coverage to non-debtor third parties," including equity shareholders and principals of a corporate debtor or an LLC. *See In re Autobahn Classics, Inc.*, 29 B.R. 625, 628 (Bankr. S.D.N.Y. 1983).

Nevertheless, it is true that the stay "can apply to non-debtors, but normally does so only when a claim against the non-debtor will have an immediate adverse economic consequence for the debtor's estate." *See Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287-288 (2d. Cir. 2003). The stay can be extended to non-debtors where "unusual circumstances" warrant such relief, such as the case of "a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case," or perhaps more generally where "a debtor and non-debtor are so bound by statute or contract that the liability of the non-debtor is imputed to the debtor by operation of law," or some other situation where the identity and interests of the debtor and the non-debtor are so intertwined that the debtor can fairly be said to be the real party in interest in the matter sought to be enjoined. *See A.H. Robins Co., Inc.,* 788 F.2d 994 (4th Cir. 1986).[14]

Further, the stay should not be extended where the non-debtor is "independently liable as, for example, where the debtor and another are joint tortfeasors or where the nondebtor's liability rests upon his own breach of duty." *Id.* at 999-1000. Ultimately, the automatic stay may only be extended to protect non-debtors where such relief is "necessary to protect the debtor's reorganization," and where the lawsuit sought to be stayed is "sufficiently likely to have a material effect upon… reorganization efforts." *Gray v. Hirsch*, 230 B.R. 239, 243 (S.D.N.Y. 1999).

It is not enough for the movant to show some limited risk, or that there is a theoretical threat to the reorganization, because it is always the case that a lawsuit against principals of the

---

[14] There has been some small confusion amongst the courts in this Circuit over whether the 4th Circuit's "unusual circumstances" standard or the 2nd Circuit's "immediate adverse consequences" standard ought to be applied. *See Robert Plan Corp. v. Liberty Mutual Ins. Co.*, 2010 WL 1193151 at *3 (E.D.N.Y. March 23, 2010). The difference between the two may be more semantic than substantive; both tests analyze many of the same factors, albeit with perhaps a different focus or emphasis on certain things. *See id.; compare A.H. Robins, supra, with Queenie, supra.* In any case, this Memorandum will focus more on the "immediate adverse economic consequence" articulation of the 2nd Circuit, since that court's rulings directly bind this Court.

Debtor *could* have *some* effect on the reorganization.  Rather, and in keeping with the principle

that extending the stay to non-debtors is *extraordinary* relief, the party seeking extension of the

stay must put forth real evidence demonstrating an actual impact upon, or threat to, the

reorganization efforts if the stay is not extended. *See id.* at 243-244.[15]

Moreover, extensions of the stay to protect non-debtor parties are the exception, not the

rule, and are generally not favored. Thus, the movant must show by "clear and convincing

evidence" that extension of the stay is warranted. *See Millard v. Developmental Disabilities

Institute, Inc.*, 266 B.R. 42 (Bankr. D. Conn. 2001); *In re Pitts*, 2009 WL 4807615, at *8 (Bankr.

E.D.N.Y. Dec. 8, 2009). For the reasons that follow, Debtors have not met this burden.

### B. The merits of extending the stay to Curd and Smith.

Debtors herein assert three (3) essential reasons why the automatic stay should be

extended to protect non-debtors Curd and Smith.

### (1). The Indemnification Agreement:

Debtors assert that the Indemnification Agreement would require Blue Point and the

other Debtors not only to indemnify Curd and Smith in the event an adverse judgment is entered

against them in the Larin Case, but also to *advance* Curd and Smith's legal expenses as their

defense of the Larin Case progresses to its ultimate conclusion. This would have an immediate,

adverse effect on the estates herein, say the Debtors, because it would deplete estate funds and

result in an administrative priority claim against the Debtors' estates. This would hinder the

---

[15] Relatedly, since one requirement of extending the stay is an actual threat to the reorganization, a corollary is that, in order for the stay to be extended, the party seeking the extension must show that there is indeed a likelihood of successful reorganization. *See In re United Health Care Org.*, 210 B.R. 228, 233 (S.D.N.Y. 1997). The parties have argued on this point in their papers and oral arguments before this Court. Suffice it to say that, while several critical matters need to be worked out before it can be known whether Debtors' reorganization can ultimately succeed, there is nothing about this case that indicates there is no likelihood of successful reorganization. Debtors have successfully resolved a great many issues over the course of this case, and approval of their amended joint plan and disclosure statement are currently pending before this Court.

reorganization, impede the paramount objective of the Bankruptcy Code to provide the Debtors with a fresh start, and result in an inequitable and prejudicial re-ordering of priorities among creditors in this case.

Larin counters by asserting that the Indemnification Agreement is unenforceable under the FLSA and NYLL, and hence that the prosecution and ultimate outcome of the Larin Case will have no effect on these bankruptcy cases. In light of these contentions, this section of the Memorandum will address two (2) issues: (A) Whether or to what extent the Indemnification Agreement is enforceable as to Curd and Smith in connection with the Larin Case; (B) Assuming the Indemnification Agreement is enforceable, what effect, if any, will it have on this bankruptcy case if the Larin Case is permitted to go forward?

(a). The enforceability of the Indemnification Agreement.

For the reasons that follow, this Court will withhold decision on whether the Indemnification Agreement is enforceable in connection with the Larin Case, and will proceed with deciding the Motion as though it is enforceable, except where otherwise indicated.

Debtors assert that the Indemnification Agreement is enforceable, because it is specifically permitted under Delaware Law.[16] It is indeed true that Delaware Law unequivocally authorizes the Indemnification Agreement. The Delaware Limited Liability Company Act provides as follows:

> Subject to such standards and restrictions, if any, as are set forth in its limited liability company agreement, a limited liability company may, and shall have the power to, indemnify and hold harmless any member or manager or other person from and against any and all claims and demands whatsoever.

6 Del.C. § 18-108.

---

[16] Delaware Law applies here, because Blue Point was formed under the laws of the State of Delaware. *See VantagePoint Venture Partners 1996 v. Examen, Inc.*, 871 A.2d 1108, 1113 (Del. 2005).

Nevertheless, Larin argues that, Delaware law notwithstanding, the Indemnification Agreement cannot be enforced in connection with the Larin Case because this would conflict with the policies behind the federal and state labor laws. Debtor counters with case law from this District which seems to uphold indemnification agreements in connection with the labor laws.[17]

The parties' arguments notwithstanding, for this Court to decide on the enforceability of the Indemnification Agreement now, as it concerns the Larin Case, would be premature. This is because it has not yet been found by any court that Curd or Smith ever violated the labor laws. That determination, as it stands now, is for the District Court to make.[18] Moreover, that determination must be made before this Court may properly decide whether the Indemnification Agreement is enforceable in connection with the Larin Case.

Courts in this Circuit have been divided over whether or to what extent indemnification agreements are enforceable as they relate to suits brought under the FLSA and NYLL; some cases have upheld such agreements, but nevertheless the overall reception to such agreements in this Circuit seems to have been somewhat hostile. *See Goodman v. Port Authority of N.Y. and N.J.*, 850 F.Supp.2d 363, 388-389 (S.D.N.Y. 2012) (discussing cases).

No court seems to have held that the FLSA and NYLL *expressly* prohibit those found liable thereunder to receive indemnification from their employers or from third parties. Rather, one major reason that the courts which have declined to allow indemnification have done so is because, in their view, enforcing such indemnification agreements would allow employers to

---

[17] *See Bogosian v. All American Concessions,* No. 06 Civ. 1633, 2011 WL 4460362, at *4 (E.D.N.Y. Sept. 26, 2011)*; Amaya v. Garden City Irr., Inc.,* No. 03 Civ. 2814, 2011 WL 564721 (E.D.N.Y.2011).

[18] Debtors argue that the Larin Case ought to be brought before, and decided by, this Court. That is not the case. The District Court has presumably thoroughly familiarized itself with the underlying facts and applicable law in the Larin Case, and the parties to the Larin Case have invested substantial resources litigating it there. Forcing the parties to bring the Larin Case here, after all this, would make the parties start almost from scratch, and it would force this Court to invest scarce judicial resources in getting up to speed on the facts and law in the Larin Case. This would be wasteful and inefficient, and would inflict considerable prejudice and delay upon the parties to the Larin Case.

violate the labor laws with virtual impunity, secure in the knowledge that someone else will pay the price for their misdeeds. Such a situation would remove a key incentive for employers to abide by the labor laws. *See id*. at 388-389.

In light of this, if Curd and Smith *did* in fact violate the federal and state labor laws, then the rationale expressed in the cases that declined to enforce indemnification agreements might apply. *See id.*; *accord Herman v. RSR Security Svc's, Ltd.,* 172 F.3d 132, 144 (2d. Cir. 1999). Nevertheless, if the District Court finds that Curd and Smith *did not* violate the federal or state labor laws, then for this Court to hold now that the Indemnification Agreement is altogether unenforceable would precipitately deprive Curd and Smith of the protection of that agreement, even though they did nothing wrong.

Such a result would be manifestly inequitable. It would also thwart the purpose of the Delaware statute(s) which authorized the Indemnification Agreement. Indeed, as the Delaware Court of Chancery observed:

> The invariant policy of Delaware legislation on indemnification is to promote the desirable end that corporate officials will resist what they consider unjustified suits and claims, secure in the knowledge that their reasonable expenses will be borne by the corporation they have served if they are vindicated.

*Donohue v. Corning*, 949 A.2d 574, 577 (Del. Ct. Chanc. 2008)(internal quotes omitted). Thus, for this Court to deprive Curd and Smith of their protections under the Indemnification Agreement, before it is even known whether they violated the labor laws, would defeat the strong public policy behind the Delaware indemnification laws.

Therefore, this Court will reserve decision on the issue of the enforceability of the Indemnification Agreement until later. *See Socialist Labor Party v. Gilligan*, 406 U.S. 583, 588-589 (1972)(observing that "problems of… prematurity" may counsel against the Court

exercising jurisdiction to determine a matter, even where such jurisdiction technically exists). For now, the Court will assume that the Indemnification Agreement is enforceable.

(b). The effect of the Indemnification Agreement on this bankruptcy case, if the Larin Case is allowed to proceed.

The above-quoted language from the Indemnification Agreement provides two (2) related but distinct benefits for those entitled to its protections: "indemnification" and "advancement."

(i). Indemnification.

"Indemnification" is essentially the right to be reimbursed for legal expenses, costs, judgments, etc. incurred (1) by a corporate principal, (2) in defense of litigation brought against her in her capacity as a principal of the company she serves. The right of "indemnification" does not, by itself, include the right to receive *advance payment* of these expenses. *See* 8 Del. C. § 145;[19] *accord Donahue*, 949 A.2d at 578-579. Rather, the underlying litigation must proceed to its conclusion, with the indemnitee paying her own legal expenses along the way. If, once the underlying proceeding is over, it turns out that the indemnitee is entitled to indemnification, then the indemnitee has a claim against the company for reimbursement of legal expenses. In this sense, it can be said that indemnification is an "all or nothing" proposition. *See McLean v. Alexander*, 449 F.Supp. 1251, 1265-1266, *rev'd on other grounds by* 599 F.2d 1190 (D. Del. 1978)(discussing the common law origin and development of the concept of indemnification).

Under Delaware law, if the indemnitee is ultimately "successful on the merits or otherwise in defense" of the underlying litigation, then she *must* be indemnified "against expenses (including attorneys' fees) actually and reasonably incurred" in connection with defending such litigation. 8 Del. C. § 145(c). Nevertheless, if the indemnitee is not "successful… in defense" of the underlying litigation, then she can still be indemnified, but only if her actions,

---

[19] This is a provision of the Delaware Corporation Act, which is specifically incorporated into the Operating Agreement.

upon which liability is predicated, were taken "in good faith and in a manner which the person reasonably believed to be in or not opposed to the best interests of the corporation." *See* 8 Del. C. § 145(a), (b).

Under Delaware law, the company makes the initial determination of whether the indemnitee acted in good faith, etc. 8 Del. C. § 145(d). This determination is entitled to great deference from the courts, and is subject to challenge by an interested party only if it was not made "on an informed basis, in good faith and in the honest belief that [it is] in the best interests of the company." [20] *See Gantler v. Stephens*, 965 A.2d 695 (Del. 2009); *accord Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150 (Del. Ct. Chanc. 2005); *see also Robert Plan Corp. v. Liberty Mutual Ins. Co.*, 2010 WL 1193151 at *3 (E.D.N.Y. March 23, 2010).

A substantial number of cases have found that extending the automatic stay to protect the interests of non-debtors was appropriate where the debtor would be under an obligation to indemnify the non-debtor. *See, e.g., See In re North Star Contracting Corp.*, 125 B.R. 368 (S.D.N.Y. 1991); *accord In re Lomas Financial Corp.*, 117 B.R. 64 (S.D.N.Y. 1990); *see also Gucci America, Inc. v. Duty Free Apparel, Ltd.*, 328 F. Supp. 2d 439 (S.D.N.Y. 2004)(remarking that "the "special circumstances" required to justify extension of a § 362(a) stay exist when a judgment against the indemnified non-debtor will directly affect the debtor's assets.").

Nevertheless, the mere existence of an indemnification obligation on the part of the Debtors is not alone enough to extend the protections of the automatic stay to a non-debtor. Rather, "the purpose served by extending the stay to directors and officers indemnified by the debtor must be consistent with the purpose of the stay itself, [which is] to suspend actions that

---

[20] This is one articulation of the familiar "business judgment rule" of corporate law, a rule whose multifarious intricacies need not be explored fully here.

pose a serious threat to a corporate debtor's reorganization efforts." *In re Uni-Marts, LLC*, 399 B.R. 400 (Bankr. D. Del. 2009).

In *In re Uni-Marts*, the court declined to extend the automatic stay to protect a principal of the debtor because, *inter alia*, the debtor had a directors-and-officers insurance policy (a "D&O Policy") whose coverage limits eclipsed even the largest likely recovery against the corporate principals in the underlying litigation, which in turn negated any likely financial impact on the estate from the litigation. *Id.* at 416-417.

Here, neither party has presented this Court with the first hint of information concerning whether Blue Point or any of the other Debtors has a D&O Policy, what the coverage limits are, nor with any reasonable estimates as to the likely size of any possible recovery against Curd and Smith in the Larin Case. There is nothing provided indicating any actual cost or expense necessary in the event the Larin Case proceeds in the District Court. Without this information, this Court is simply not in a position to evaluate the specific threat that the continued prosecution of the Larin Case poses to the Debtors' estates, in light of the Indemnification Agreement.

In asserting that the Indemnification Agreement warrants enjoining the Larin Case from proceeding, debtors rely principally on *Robert Plan Corp. v. Liberty Mutual Ins. Co.*, 2010 WL 1193151 at *3-4 (E.D.N.Y. March 23, 2010). In that case, the District Court affirmed the action of Judge Grossman of this Court in preliminarily enjoining a state-court contempt action, against certain non-debtors, who were officers of the corporation. Judge Grossman's decision is based on the determination that the corporate debtor would be required to indemnify the non-debtors under Delaware law, pursuant to an indemnification agreement substantially similar to the one at issue here. *See Robert Plan*, 2010 WL 1193151 at *1-2. The basic reasoning for that decision, as explained by the District Court in affirming Judge Grossman on appeal, is as follows:

> If [the state court plaintiffs] lose their contempt suit, Delaware law requires [Debtor] to indemnify the Officers for their attorneys' fees, thereby creating a claim (and hence, an "adverse economic consequence") for the estate. 8 Del. C. § 145(c). Alternatively, even if Appellants win, Robert Plan's By–Laws still require it to indemnify the Officers, if they acted in good faith. And, under Delaware law, Robert Plan's board of directors is authorized to decide whether the Officers in fact acted in good faith. 8 Del. C. § 145(d). Robert Plan has preemptively done so, informing Judge Grossman that it would indemnify the Officers from any judgment based on their board's finding of good faith…. [And if the state court plaintiff's were to challenge the board's determination, then that would require them] to meet a doubly high burden of showing, essentially, that there can be no good faith disagreement regarding whether the Officers acted in good faith [under the "business judgment rule" generally requiring court deference to the decisions of a corporation's management].  And any such litigation would pose the significant prospect of draining the estate even more because, if Appellants lose or otherwise can't demonstrate the directors' lack of good faith, the Debtors would then be obligated to indemnify the directors for the legal fees they incurred defending their decision to indemnify the Officers. Moreover, because the Debtors have already pledged to indemnify the Officers, a claim against the Officers will, when entered, constitute a claim (and hence, an "immediate adverse economic consequence") against the estate….
>
> [G]iven the [known fact] that the Officers had such a [nearly] absolute right [to indemnification], the Bankruptcy Court properly protected the estate by staying the contempt case.

*Robert Plan,* 2010 WL 1193151 at *3-4.

*Robert Plan* is distinguishable from this case. As the above-quoted language indicates,

under the particular circumstances before Judge Grossman, the outcome of the underlying state-

court contempt litigation had almost no bearing on whether the debtor corporation would

ultimately be required to indemnify the officers. Since the debtor had indicated that its board of

directors had decided to indemnify the officers even if they lost the state-court litigation, and

since that decision would be so difficult to challenge under the "business judgment rule," the

obligation to indemnify, with its attendant adverse consequences for the estate, was a virtual, if not an objective legal, certainty. *See id.* at \*3-4.

Here, though, this Court has not received any indication that Blue Point's Board intends to find that Curd and Smith acted in good faith, etc. even if they are found to have violated the federal and state labor laws.[21] Moreover, here, Blue Point's obligation to indemnify is not as contingent on the decision of Blue Point's Board (as defined in the Operating Agreement), nor on the provisions of Delaware law, as was the debtor's obligation in *Robert Plan*. This is because, as discussed above, depending on whether Curd and Smith are ultimately found to have violated the federal and state labor laws, the Indemnification Agreement may not ultimately be enforceable despite any provision of the Operating Agreement or Delaware law. Ergo, the prospect of an "adverse consequence" to the Debtors' estates, because of the Indemnification Agreement, has not been shown to be as "immediate" or "actual" here as it was in *Robert Plan.*

Nevertheless, Debtors stress that, if indeed Curd and Smith are ultimately entitled to indemnification, then that will result in their being able to assert administrative-priority claims against the estates herein under 11 U.S.C. §§ 507(a) and 503,[22] which would result in an inappropriate re-ordering of priorities among creditors in this case, to the detriment of the Debtors' estates and of the general creditor body. The mere possibility of this poses such a grave risk to the reorganization, and so contravenes the policies behind the Bankruptcy Code, that the Larin Case ought not be permitted to move forward, say the Debtors.

---

[21] However, at a hearing, Debtors' counsel did indicate that the Debtors intended to "advance" Curd and Smith's legal fees, until "someone says 'You can't.'" This matter is discussed below.

[22] Generally, in bankruptcy, certain species of unsecured claims are favored over others, and hence usually must be paid in full before the general, or "non-priority," unsecured creditors get paid anything. "Administrative claims," which are generally claims relating to expenses incurred in the administration of a debtor's estate, are very near the top of the "pecking order." *See* 11 U.S.C. §§ 507(a) and 503.

It is worth noting that the Debtors have cited no legal authority, of any kind, to support the assertion that Curd and Smith's claims under the Indemnification Agreement would constitute administrative priority claims. Conclusory assertions do not an argument make. However, there *is* case law indicating that indemnification claims, such as those possibly accruing on behalf of Curd and Smith here, might be mere general, unsecured claims. *See, e.g. In re Amfesco Industries, Inc.*, 81 B.R. 777 (Bankr. E.D.N.Y. 1988). Thus, unless the Debtors provide this Court with some legal authority indicating that Curd and Smith's indemnification claims would receive some administrative or other priority status under the Bankruptcy Code, there is no basis here for this Court to conclude as much.[23]

Therefore, in light of the foregoing, the Debtors have not met their burden of showing a "likelihood of success" in having the stay extended to Curd and Smith based on their indemnification rights under the Operating Agreement. This is because they have not shown that it is more likely than not that there will be clear and convincing evidence that such rights pose a likely, immediate threat to the administration of the estates herein.

(ii). Advancement.

Debtors assert that permitting the Larin Case to move forward would work an immediate, adverse economic consequence upon the estates herein, because not only are the Debtors required to *indemnify* Curd and Smith under the Operating Agreement, but the Debtors are also required to *advance* Curd and Smith's legal expenses until the Larin Case is concluded.

The right of "advancement" is distinct from, but related to, the right of indemnification. While indemnification is more in the nature of reimbursement of expenses, advancement is, in

---

[23] It should be noted that the Court is not specifically *holding* that Curd and Smith's claims for indemnification would or would not be administrative priority claims. Ideally, that determination should await further briefing and argument upon motion. Rather, this Court is merely pointing out that the Debtors, as the movants, have not met their burden of showing that the likelihood of Curd and Smith's claims receiving administrative priority is such a threat to the Debtors' reorganization efforts that the Larin Case ought to be stayed.

essence, an extension of credit. *See Advanced Min. Systems, Inc. v. Fricke*, 623 A.2d 82, 84 (Del. Ct. Chanc. 1992). "Advancement" means that, while the underlying case is pending, the company must pay the indemnitee's legal expenses. If, ultimately, the indemnitee is entitled to indemnification, then the indemnitee is under no obligation to return the moneys advanced. However, if the indemnitee is ultimately *not* entitled to indemnification, then he or she must repay to the company all sums advanced. *Id.* at 84; *accord* 8 Del. C. § 145(e) (empowering corporations to provide for advancement).

The Operating Agreement clearly provides a right of advancement, as indicated in the above-quoted language from Article 8.3 of the Operating Agreement. Nevertheless, that right, under both the Operating Agreement and Delaware law, is conditioned "upon receipt of an undertaking by or on behalf of such director or officer to repay [the amounts advanced] if it shall ultimately be determined that such person is not entitled to be indemnified …." *See* 8 Del. C. § 145(e). Under Article 8.3 of the Operating Agreement, said undertaking must be in writing.

Here, there is no indication in the record before the Court that either Curd or Smith has delivered to Blue Point, or any of the other Debtors, a "written undertaking" to repay litigation expenses advanced by the Debtors. Therefore, this Court cannot find that any of the Debtors has a present obligation to advance Curd and Smith's legal expenses, at least until a "written undertaking" is delivered.

Even so, assuming that Curd and Smith had delivered the necessary written undertaking, the Debtors here are operating as debtors-in-possession in bankruptcy. Thus, certain restrictions are placed on their ability to expend funds which constitute property of their respective bankruptcy estates. Therefore, the Debtors might need the permission of this Court, on notice and a hearing, before they are actually permitted to advance Curd and Smith's litigation

expenses. *See* 11 U.S.C. § 363(b). *See also Covering Your Tail: Court Approves Advancement of Legal Fees to Directors and Officers under § 363*, 26-JUN Am. Bankr. Inst. J. 26 (June, 2007) (discussing developing case law on the subject). *Cf. also In re GB Holdings, Inc.*, 2006 WL 4457350 (Bankr. D. N.J. Sept. 21, 2006)(authorizing advancement of legal expenses under the debtors' D&O Policy).

Therefore, in light of the foregoing, without a further showing by the Debtors, this Court cannot conclude that they have met their burden of proving that Curd and Smith's advancement rights under the Operating Agreement are more likely than not to be shown, by clear and convincing evidence, to pose an "immediate, adverse" consequence to the estates herein. This is because the Debtors have not shown that they are under an immediate obligation to advance such funds, nor that they have the present ability to do so absent further action by this Court.

Also, it is worth noting that, if the Debtors are ultimately obliged to advance funds and to indemnify Curd and Smith, then creditors need to know so that these costs and potential expenses of the Debtors can be incorporated into the Debtors' evolving plan of reorganization.

(2). Collateral estoppel/vicarious liability.

The parties, in their papers, have at least tacitly touched on the issue of collateral estoppel/vicarious liability. This is a legitimate concern. It goes without saying that artificial entities, such as the Debtors here, act only through their flesh-and-blood agents. Thus, if Curd and Smith, acting as agents for some or all of the Debtors, did indeed violate the federal and state labor laws, then the Debtors may be collaterally estopped from denying liability for their actions in subsequent litigation centering around the same underlying facts. In order for the Debtors to protect their interests here, it may be necessary for them to get involved in the Larin Case, even though they are not currently parties to that litigation.

Some courts have justified extensions of the automatic stay based in part on similar concerns. *See, e.g., In re American Film Technologies*, 175 B.R. 847, 850-851 (Bankr. D. Del. 1994)(discussing case law on the matter); *In re Ionosphere Clubs, Inc.*, 111 B.R. 423 (Bankr. S.D.N.Y. 1990). Nevertheless, the Second Circuit Court of Appeals has indicated some skepticism about applying the stay to a non-debtor on this basis *alone*, citing concerns over "vast and unwarranted interference with creditors' enforcement of their rights against non-debtor co-defendants." *See Queenie*, 321 F.3d at 288.

In any case, such concerns pose no immediate issue here, so as to warrant the granting of a preliminary injunction. Larin dismissed the Debtors as formal defendants in the Larin Case. There is nothing before the Court which indicates that any possible party to the Larin case is actively contemplating "later use against the [D]ebtor[s] of offensive collateral estoppel…." *Id.* There is not now before the Court anything which indicates that collateral estoppel concerns pose the risk of immediate, adverse consequences to the Debtors' estates, at least in more than a theoretical or speculative sense. Should any such action arise in the future, this Court would be able to make whatever appropriate ruling may be necessary on behalf of the Debtors' estates.

An actual, not just a theoretical, likelihood of harm to the reorganization must be shown before the automatic stay may be extended to protect non-debtors.

(3). The effect on the Debtors' estates if Smith is forced to defend the Larin Case.

Lastly, Debtors argue that, since Smith, as president of Blue Point, is the person generally in charge of the Operating Debtors, he ought not be forced to defend the Larin Case, because the aggravation and expense of litigating that matter would divert his time and attention from his work. This, in turn, would materially impede the reorganizations herein.

Some cases have extended the stay to protect non-debtors over similar concerns. *See, e.g., A.H. Robins,* 788 F.2d at 999-1007 (discussing case law dealing with the issue). Nevertheless, these cases involved very large, complex reorganizations, and the litigation sought to be stayed presented very formidable discovery and other demands, together with very large numbers of potential claimants. Therefore, to allow the litigation to proceed against those in charge of the debtors would be so burdensome that the principals would hardly be able to devote the needed time and attention to the debtors' reorganization. *See id.* (discussing cases).

Indeed, in *A.H. Robins*, the debtor was driven into bankruptcy by multiple thousands of products-liability actions stemming from an allegedly defective medical device, and "the costs of defending these suits both to Robins and to its insurance carrier had risen into the millions." Moreover, "[a] large amount of the time and energies of Robins' officers and executives was… being absorbed in preparing material for trial and in attending and testifying at depositions and trials." *See id.* at 995.

These cases have indeed presented their fair share of thorny issues since the Debtors filed their bankruptcy petitions. Nevertheless, these procedurally-consolidated cases are nowhere near as large and complex as *A.H. Robins* and other cases discussed therein. Moreover, here, Debtors have presented virtually no specific information concerning the nature and extent of the burdens that would be placed on Smith if he is forced to defend the Larin Case. The *A.H. Robins* court had ample information before it to address these concerns and to determine that letting the subject litigation go forward would materially hinder the reorganization. *See id*. at 999-1007. This Court, by contrast, does not.

Therefore, absent a more thorough and specific showing by the Debtors, this Court cannot find that the Debtors are more likely than not to show, by clear and convincing evidence,

that Smith would be so burdened by his defense of the Larin Case that his ability to manage the Operating Debtors' affairs would be undermined, to the material detriment of the ongoing reorganizations here.

### C. Balance of hardships.

Moreover, even assuming that there is a serious enough question going to the merits so as to make the claims raised in the Adversary Complaint a fair ground for litigation, Debtors have not met their burden to show that the "balance of hardships tips *decidedly* in their favor." The "balance of harms" will be found to "tip decidedly" in Debtors' favor where the overall costs of denying a preliminary injunction outweigh the benefits of granting it. *See Citigroup Global Markets, Inc.*, 598 F.3d at 36.

Debtors assert that the balance of hardships tips decidedly in their favor, essentially raising the same arguments that they advanced in seeking extension of the stay. Larin responds that there is a 3-year statute of limitations, which applies when a plaintiff alleges willful violations of the FLSA, as Larin has alleged here, which is still running as to plaintiffs who may wish to join the Larin Case.[24]  Additionally, Larin worries over the deterioration of evidence, the likelihood of which increases as the Larin Case is delayed.[25]

This Court need not decide any of this in order to find that Debtors have not shown that the balance of harms tips *decidedly* in their favor. For the reasons discussed above, Debtors have

---

[24] Larin cites *Guzman v. VLM, Inc.*, 2007 WL 2994278 (citing 29 U.S.C. § 255). Debtors characterize the Larin Case as a "class action," and they cite *In re World Com. Secs. Litig'n*, 496 F.3d 245, 255-56 (2d. Cir. 2007) for the notion that the abovementioned statute of limitations does not apply to class actions. Larin responds that the Larin Case has not yet received class-action certification from the District Court. Hence, plaintiffs who might wish to join the Larin Case would be full-fledged plaintiffs in their own right, and not merely members of a class. Hence, as to them, at least until the District Court certifies the Larin Case as a class action, the statute of limitations continues to run.

[25] Debtors respond that Larin has not been expeditious in litigating before this Court, so the concerns over deterioration of evidence are illusory.

not shown, with sufficient particularity, whether or to what extent any substantial or immediate harm will accrue to the estates herein if the Larin Case is permitted to go forward.

IV. Irreparable harm:

For the same essential reasons that the Debtors have not shown that the balance of harms tips decidedly in their favor, this Court cannot find that they have met their burden to show that they would suffer irreparable injury in the absence of a preliminary injunction.

V. The public interest:

The Debtors seek a preliminary injunction presumably to vindicate the fundamental bankruptcy policies of facilitating the reorganization, equality among similarly-situated creditors, and the centralization of all disputes affecting the Debtors' bankruptcy *res* before one court. Larin seeks to proceed with the Larin Case presumably to vindicate the fundamental FLSA policy of ensuring certain minimal standards of living for American workers. *See Vanskike v. Peters*, 974 F.2d 806, 810-811 (7th Cir. 1992).

For the reasons discussed above, Debtors have not shown that the aforementioned bankruptcy policies would be immediately threatened by the continued prosecution of the Larin Case. A preliminary injunction here would doubtlessly impinge, to some extent, upon the ability of Larin herself, and any other potential Larin Case plaintiffs, to pursue their claims under the labor laws. While the concerns embodied in the Bankruptcy Code are certainly important, this Court cannot say that they are *more* important than the policies behind the labor laws.

## Summary

The fundamental problem with the Motion is that the Debtors have not submitted to this Court sufficient information to warrant imposing the extraordinary relief embodied in a

preliminary injunction. Certainly, the Debtors have pointed out various concerns that, in theory, could pose some hindrance to the Debtors' continuing reorganization efforts.

Nevertheless, merely pointing these things out is not enough. Debtors have not shown with specificity how these concerns pose a likely, material, and actual (not just theoretical) hindrance to the Debtors' reorganization, so as to justify the impingement upon the rights of current and future Larin Case plaintiffs which would flow from this Court's issuance of a preliminary injunction. Rather, '[w]hat [Debtors] have asserted are conclusory statements regarding the generalized impact on [their estates]…." Indeed, "[a]lthough it may be that the matters here are 'inextricably intertwined,' [Debtors] have not pointed to any concrete, specific examples of how that is so, other than the generalized conclusions presented in their arguments." *Chord Assoc's, LLC v. Protech 2003-D, LLC*, 2010 WL 1257874 at *12 (E.D.N.Y. March 25, 2010). Therefore, this Court cannot find that the Debtors have met their burden.

### <u>Conclusion and Order</u>

The Debtors, as the parties moving for a preliminary injunction, bear a heavy burden of both proof and persuasion. For the reasons discussed above, the Debtors have not met their burden. Therefore, the Motion is DENIED.

*So ordered.*



**Dated: Central Islip, New York**
       **December 26, 2012**

**Dorothy Eisenberg**
**United States Bankruptcy Judge**